UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Beverly J. Getz,
Executrix for the Estate of Robert T. Getz,       Case No. 3:13 cv 1492

        Plaintiff

   v.                                              MEMORANDUM OPINION
                                                                                     AND ORDER

J. Swoap,
Wood County Sheriff's Office, et al.,

        Defendants

      This matter comes before me on Defendants' motion for summary judgment (Doc. No. 20), Plaintiff's opposition (Doc. No. 35), Defendants' reply (Doc. No. 36), and Plaintiff's sur-reply (Doc. No. 40).  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  For the reasons set forth below, I find Defendants' motion well taken.

## BACKGROUND

      The following facts are undisputed.  On November 27, 2011, at approximately 7:20 p.m. Deputy Jody Swoap was sitting stationary in his police cruiser with his directional lights on while in the northbound lane of Carter Road, outside of Bowling Green, Ohio.  Robert Getz was driving his 2004 Chevy Cobalt and approaching Swoap from the southbound lane.  Getz's vehicle had only one operational headlight.

      Swoap turned and followed Getz to the intersection of Carter and Sugar Ridge Road.  Swoap did not activate his overhead lights until he saw that Getz was turning South on Sugar Ridge Road.

Swoap followed Getz until he turned into his driveway. Swoap followed Getz into the driveway and radioed his location to the dispatch at 7:22 p.m.

Getz drove his vehicle past the house to the back of the driveway where he circled around in front of a barn and then headed back in Swoap's direction. Getz stopped his car pulling up "bumper to bumper to [Swoap] close enough where [he] could not read his license plate." (Swoap Dep. at p. 24). Swoap radioed in again to the dispatch and provided a description of the vehicle. Swoap put his spotlight on the car in order to see the occupants of the vehicle. As Swoap radioed into the dispatch, he "saw the car lunge forward, probably less than a foot, and then start to back up." (*Id.* at p. 26). Swoap radioed a request for back-up.

Getz then backed his vehicle up and began to drive around Swoap's vehicle. Swoap then put his car into drive and angled it to prevent Getz from pulling out of the driveway. Swoap exited his vehicle and yelled at Getz to stop his car. (*Id.* at p. 29). Swoap repeated the command to stop the vehicle at least twice. Getz's car continued to slowly advance toward Swoap. At that point, Swoap drew his sidearm and gave Getz another command to stop the vehicle. (*Id.* at p. 30). Getz's vehicle stopped and Getz heeded a further command to shut off the car.

Getz then exited the car, per Swoap's command. When Swoap saw that Getz did not have a weapon, he re-holstered his sidearm. (*Id.*) After Getz got out of his car, he began yelling at Swoap, telling him to get off his property. (*Id.* at p. 32). When Swoap tried to ask who he was, Getz told him that "[e]verybody knows who I am." (*Id.*) Swoap began to explain the basis for the stop but Getz was argumentative, angry, and yelling. (*Id.* at p. 36-37).

Getz was frustrated and told Swoap he was leaving, as he stood next to his (Getz's) vehicle with the door open. According to Swoap, Getz made a motion towards his own vehicle and Swoap advised him that he was "not free to leave." (*Id.* at p. 38). Swoap repeated the statement multiple times but Getz moved to get into his car. (*Id.* at p. 40). Swoap moved towards Getz and reached

2

into the car and grabbed Getz's hand which was gripping the steering wheel. (*Id.* at pp. 40-41). Getz attempted to push Swoap away with his shoulder and told Swoap to "get off of him." (*Id.* at p. 41).

Swoap moved his hand from the steering wheel, "grabbed his wrist and his upper arm and pulled him out" of the car." (*Id.* at p. 42). According to Swoap, Getz offered resistance to this action by pulling in the opposite direction. Swoap testified the he used "enough force to maintain [his] control of [Getz] and remove him from the vehicle." (*Id.* at p. 43).

Swoap then advised Getz to put his hands behind his back as he was under arrest. (*Id.* at p. 44). Getz then told Swoap that he was " 'going inside' and began to walk in front of [Swoap's] car, which would be the direction of his house." (*Id.*) Swoap told Getz he was not going into his house and he stepped in his path. At the same time, Swoap grabbed Getz's upper arm and advised Getz to put his hands behind his back. (*Id.* at p. 46). Swoap then used his body to displace Getz's balance and as he did so, "Getz spun around and sprawled himself over the hood of [Swoap's] vehicle." (*Id.*) Getz then reached out with his left hand, grabbed the push bar[1] on Swoap's car and with his right hand, grabbed the top of the hood. (*Id.* at p. 47).

Swoap took a hold of his left hand and put the handcuff on his left wrist. When Getz did not comply with Swoap's request to bring his right wrist behind his back, Swoap took his right arm and rotated Getz's body so that his right hand wrist was in position to be handcuffed as well. (*Id.* at p. 48). Swoap then attempted to walk with Getz but he "locked up his legs" and refused to walk for Swoap. Swoap then guided Getz to the front of the cruiser. (*Id.* at p. 50). Swoap reported to dispatch that he had Getz in custody at 7:24 p.m.

At this point the parties differ in their version of the events.

---

[1] Also known as a push bumper grill guard or nudge bar, it is generally found on the front of police vehicles and used to push inoperable vehicles off the roadway.

3

**Plaintiffs' version**

According to Trisha Getz, Robert Getz's daughter, upon her arrival, she recalled her observations:

> A: Okay. When I pulled in, there was the cop car and it was flashing, and then I then immediately looked to see what was going on, and my dad had his face pushed up against dad's car, and Swoap was leaning on him, on his left face, on the window.

(Getz Dep. at p. 41). After pulling into the driveway Trisha exited her car and approached her father inquiring as to what was going on. (*Id.* at p. 45). Swoap told Trisha that her father was resisting arrest. (*Id.*) Trisha "asked [Swoap] if dad could sit down" and Getz was allowed to sit in his own car. (*Id.* at pp. 45-46) According to Trisha, her father told her the handcuffs were hurting his hands and asked her to ask Swoap to loosen the handcuffs. (*Id.*). Trisha also testified her father told her he had asked several times to call the sheriff. (*Id.*)

Trisha reported her father was sitting handcuffed in his own vehicle, on the driver's side, with his feet toward the outside of the car. (*Id.*) She then went to her car to get wipes to clean the injury to her father's face and to his wrists, which according to her testimony, were bleeding. (*Id.* at pp. 47-52). Trisha continued to ask Swoap to loosen the handcuffs, to "jokingly" call the sheriff, since he lived down the road, and asked if she could take her father into the house for oxygen as his COPD was flaring up. (*Id.* at p. 53-54). Swoap told Trisha that "the only place [her] father [wa]s going [wa]s in the back seat of [his] car and to jail." (*Id.* at p. 55).

Swoap did offer to call the E.M.S. but was told by Trisha and Mr. Getz that the E.M.S. was unnecessary, what was needed was oxygen. (*Id.*) According to Trisha, Swoap asked her if she lived at this address and she said yes. (*Id.* at p. 58). Swoap then gave her a choice to either get in her car

4

and leave or to go into the house, otherwise she would be subject to arrest. (*Id.*) When Trisha inquired why she would be subject to arrest, Swoap told her for invading the crime scene. (*Id.*) Trisha then went into the house. (*Id.*) Trisha estimated she "was probably outside 20 minutes" before going into the house. (*Id.* at p. 61). She dialed her brother Tim as she was walking in the door to advise him of the events taking place. (*Id.*)

Trisha also got her mother, who was in the house at the time and advised her of the situation and told her to get outside. (*Id.* at p. 60). Beverly Getz, Robert's wife, then proceeded outside. (Beverly Getz Dep. p. 81). Trisha Getz stayed in the house. (Trisha Getz Dep., p. 67).

According to Beverly Getz, Deputy Spees arrived on the scene and she asked him if she could get his inhaler to administer the medicine to ease his breathing difficulties. (*Id.* at p. 81-81). Beverly testified that Robert Getz also asked Spees to loosen the handcuffs as they were "quite painful." (*Id.* at p. 83). According to Beverly, Spees "took them right off." (*Id.*) Beverly testified as follows:

> A: I know that Swoap said he took them off, but I don't remember that. I know that Spees said, I know Bob. You can take - - he doesn't need those handcuffs. Take them off.
>
> Q: Spees said that?
>
> A: Yes.

(*Id.* at pp. 83-84). Robert Getz was then told to go into the house and get his oxygen and Beverly stated that he did use his inhaler after the handcuffs were removed. (*Id.* at p. 85).

A little later, Spees took pictures and Beverly stated that Swoap stood back and was silent as it was clear that "Spees was in charge at that point." (*Id.* at p. 86). Spees and Robert Getz engaged in conversation with Getz asking Spees to call the sheriff because "he lived down the road from us." (*Id.*)

5

When Robert Getz went into the house to get his oxygen, Beverly stayed outside and at that point her son, Tim Getz, arrived. (*Id.* at pp. 98-99). Beverly recounted that after Tim showed up he began talking to Spees. (*Id.* at p. 101).

Upon being contacted by his sister, Tim Getz immediately proceeded to his father's house and upon arriving approached the scene and spoke to Spees:

> A: And he got out of his car, and I said, what's going on here? And he said, well, he said, we had a little situation here. Your dad had a headlight out. I said, a headlight out? And from what I'm hearing, this went on for this?
>
> And he said, well - - he said you got to understand, Tim, that your dad was trying to move his car back and forth. I said, oh. I said, so who was the guy that done this? And he said it was Deputy Swoap. Well, where's he at? He's in the car writing his ticket up. I said, oh.

(Timothy Getz Dep. pp. 60-61).

Timothy Getz then asked to speak to Swoap. (*Id.* at p.61). Spees advised letting "the court system figure this out." (*Id.* at p. 62). Timothy Getz waited there until the ticket was brought out and at that time spoke to Swoap:

> A: I said, first of all - - and I pointed right at him just like I am right now. I said, first of all - - I was real close to him. I pointed at him just like I am right now, and I said, first of all, I hope you have a dad. Second of all, I hope you never have anybody treat your dad the way you just treated my dad.

(*Id.* at p. 67).

**Defendants' version**

According to Swoap, after Trisha Getz pulled in the driveway, she exited her vehicle and Swoap told her to either "go inside or step back into her vehicle and I would explain what's going on after I was finished." (Swoap Dep., p. 50). Swoap was in the process of "grabbing Robert" as he gave Trisha Getz direction on how to proceed. (*Id.* at p. 51). Swoap testified that at the same time, he was "dealing with Robert who was not being compliant." (*Id.*)

6

Swoap walked Robert to the back of the cruiser and opened up the passenger side of the car and asked Robert, more than once, to sit down on the seat. (*Id.* at p. 52). Robert did not sit down and Swoap could hear the back-up unit approaching. (*Id.* at pp. 52-53). Swoap waited for Sergeant Spees arrival on the scene. "When Sergeant Spees arrived and approached, he appeared to have a better rapport with Robert. They must have spoken in the past." (*Id.* at p. 53).

At this time, Trisha Getz remained by her car and Swoap estimated that Spees arrived shortly after she came on the scene. (*Id.* at p. 54). As Spees was able to communicate with "Robert on a civil level," Swoap stepped back. (*Id.*) Spees was able to get Robert to sit in Swoap's cruiser. Spees returned to speak with Swoap and they discussed the situation. Spees asked Swoap if he knew that Robert was bleeding and Swoap answered that he was not aware Getz was bleeding. (*Id.* at p. 56). Swoap then removed the handcuffs so that Getz could use his inhaler. (*Id.* at p. 62).

Swoap and Spees discussed charges and Spees directed him to contact the prosecutor to discuss this. Ultimately Robert Getz was cited for a headlight violation and for obstructing official business, a misdemeanor. (*Id.* at p. 65) Swoap approached Beverly and Timothy Getz with the citation as it required a signature. Tim Getz told Swoap he "should be ashamed of [him]self," and Swoap noted on the citation the term "unable to sign," and gave the copy to Beverly Getz. (*Id.* at p. 69). According to the communications event report, the scene was cleared by 8:33 p.m.

**Subsequent events**

The parties do not dispute that later that evening, at approximately 10:50 p.m., Getz went to the emergency room at Wood County Hospital stating he was "alleged[ly] assault[ed] by [a] Wood County Sheriff Deputy." (Doc. No. 22-7 at p. 8). He was treated for a superficial skin tear on his left wrist and a small abrasion on his right cheek. The hospital notes indicate "wrist skin tears," "multiple skin tears, skin thin, bruised, adaptic and gauze wrapped." (*Id.* at p. 11). Getz was treated and discharged.

7

A few days later, Trisha and Timothy Getz met with Sheriff Mark Washlyshyn and Chief Deputy Eric Reynolds. The focus of the meeting was to complain about the incident involving Deputy Swoap and to request he be disciplined or terminated. (Reynolds Dep., p. 19). The Sheriff stated that he would initiate an investigation into the incident. (Wasylyshyn Dep., p. 23).

In December 2011, Chief Deputy Eric Reynolds, road patrol Lt. Rod Konrad, and Captain Scott Frank conducted an internal review and found Deputy Swoap did not use excessive force. (Doc. No. 21-25). In May 2012, over the objections of Deputy Swoap and the Sheriff, the Bowling Green Prosecutor dismissed the citations.

In June 2012, the Sheriff requested the Buckeye Sheriff's Association to investigate the incident. Cliff Vandermark, a veteran officer and detective with Defiance County, was chosen to carry out the investigation. On September 6, 2012, after collecting the incident reports, court documents, use of force reports, and interviewing Detective Swoap, Vandermark concluded the use of force by Deputy Swoap was appropriate. Vandermark attempted to interview Robert, Beverly, Trisha, and Timothy Getz but they declined to speak with him.

On July 10, 2013, Robert Getz filed this civil rights action alleging violations of 42 U.S.C. § 1983, specifically false arrest and excessive force involving Deputy Swoap, as well as a claim of failure to train and supervise against the Sheriff and Wood County. On March 7, 2014, Plaintiff's spouse, Beverly J. Getz was appointed Executrix of Robert T. Getz's estate following his death, and substituted as the Plaintiff in this litigation. (Doc. No. 16).

## APPLICABLE LEGAL STANDARDS

**Summary Judgment**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

8

56(a). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071.

The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp.2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

**Qualified Immunity**

Qualified immunity shields "government officials performing discretionary functions… from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity provides a broad range of protection, as it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992), *cert. denied,* 506 U.S. 1080 (1993).

> Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S.Ct. 1247, 157 L.Ed.2d 1068 (2004) (Kennedy, J. dissenting) (quoting *Butz v. Economou*, 438 U.S. 478, 507, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), for the proposition qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law.")

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Like absolute immunity, qualified immunity "is an *immunity from suit* rather than a mere defense to liability . . . [and] is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original).

10

The analysis employed by the Sixth Circuit in determining qualified immunity focuses on whether a constitutional right was violated and whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right. *Occupy Nashville v. Haslam*, 769 F.3d 434, 442 (6th Cir. 2014), citing *Saucier v. Katz*, 533 U.S. 194 (2001). In *Pearson*, the Supreme Court approved disregarding the mandatory analytical sequence adopted in *Saucier* and allowed district courts to "exercise their sound discretion in deciding which of the two prongs in the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 555 U.S. at 236.

While the order of these questions is left to the discretion of the district court, "if either one is answered in the negative, then qualified immunity protects the officer from civil damages." *Goodwin v. City of Painesville*, No. 14-3120, __F.3d__ (6th Cir. March 19, 2015), citing *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). Once the defense of qualified immunity is raised, the burden shifts to the plaintiff to prove defendants are not entitled to qualified immunity. *Rodriquez v. Passinault*, 637 F.3d 675, 689 (6th Cir. 2011).

## DISCUSSION

**Positions of the Parties**

While the Defendants seek summary judgment on all three causes of action, Plaintiff does not contest the motion as to Counts I (false arrest) and III (failure to train and supervise). (Doc. No. 35 at p. 1, n. 1). Accordingly, summary judgment will be granted to Defendants on those claims and the discussion will focus on the excessive force claims in Count II.

Plaintiff's complaint takes issue with the manner in which he was handcuffed as well as the duration as follows:

> 13. Defendant Swoap grabbed plaintiff's arms and handcuffed him. The handcuffs were placed on plaintiff in a brutal manner, specifically they were placed on plaintiff very tightly, causing plaintiff extreme pain and serious injury.

11

> Defendant Swoap also pushed plaintiff against his police car and placed his entire weight into plaintiff as he (defendant Swoap) pushed him (plaintiff) against the vehicle while tightening the handcuffs on plaintiff even more. . .
>
> 14. Because the handcuffs were so tight, plaintiff requested defendant Swoap to loosen the handcuffs because they were so tight and hurting him. Plaintiff told defendant Swoap that the handcuffs were too tight and were cutting into his wrist. Defendant Swoap refused plaintiff's request that the handcuffs be loosened. Plaintiff made several requests to defendant Swoap that the handcuffs be loosened due to the pain and injury it was causing and each time his request was denied by defendant Swoap. At one point plaintiff told defendant Swoap that the handcuffs hurt like hell and could he please loosen them or at least change their position. Defendant Swoap refused plaintiff's plea. Defendant Swoap denied plaintiff's requests regarding the handcuffs even though plaintiff's wrists were torn up from the too-tight handcuffs and plaintiff was bleeding at the wrists.
>
> . . .
>
> 19. The force used against plaintiff by defendant Swoap, including but not limited to the manner in which the handcuffs were used, i.e., applying and keeping the handcuffs on plaintiff too tightly, was unnecessary, unreasonable and excessive.

(Compl. at pp. 3-5).

**Excessive Force Claims Against Deputy Swoap**

The Fourth Amendment guarantees the right to be free of excessive force where the arrest or seizure is unreasonable under the law. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). In the present case, Plaintiff asserts excessive force was used in the application and maintenance of the handcuffs, despite requests for their removal. Because these are discrete actions, each will be analyzed separately.

**1. Application of the Handcuffs**

As noted by the Sixth Circuit in *Morrison v. Board of Trustees of Green Twp.*, 583 F.3d 394, 400-01 (6th Cir. 2009)

> Whether an officer has exerted excessive force during the course of seizure is determined under an "objective reasonableness" standard. *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S.Ct.

>1865, 104 L.Ed.2d 443 (1989)). This entails "balanc[ing] the consequences to the individual against the government's interests in effecting the seizure." *Burchett v. Keifer*, 210 F.3d 937, 944 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). The assessment involves a fact-specific inquiry based on the totality of the circumstances that "pay[s] particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat of safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Kostrzewa*, 279 F.3d at 639 (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865).

Turning to the three factors to be considered in this assessment, I also am directed by the Circuit's guidance noting "[t]hese factors are assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight." *Brown v. Lewis*, 779 F.3d 401, 2015 WL 794705 *13 (6th Cir. Feb. 26, 2015), quoting *Burgess v. Fischer*, 735 F.3d at 472. I also consider the totality of the circumstances in determining whether those circumstances justified Deputy Swoap's conduct in handcuffing Robert Getz.

In the first factor under *Graham*, the severity of the crimes here, a headlight violation and obstructing official business are certainly not serious offenses in and of themselves. *See e.g. Thomas v. Plummer*, 489 Fed. Appx. 116, 125-26 (6th Cir. 2012). Therefore, this factor weighs in Plaintiff's favor.

The second factor in *Graham* addresses the reasonableness of the force and whether the suspect posed an immediate threat to the safety of the officer. Here, the record reflects from the beginning of the encounter the cruiser's overhead lights were activated and clearly visible by Getz. Getz then stopped his car just short of Swoap's cruiser "bumper to bumper" and so close that Swoap could not read the license plate. As Swoap radioed into the dispatch on his status, Getz's car lunged forward then started to back up. Getz's vehicle then began to go around the cruiser and Swoap positioned his vehicle at an angle to block Getz's exit from the driveway. Swoap then exited

13

his vehicle and commanded Getz to stop his vehicle. Getz's vehicle continued to slowly advance toward Swoap, who then drew his sidearm and again ordered Getz to stop his vehicle.

Even when viewed in the light most favorable to the Plaintiff, Getz's actions were sufficient to place Swoap on notice of an immediate threat. When Getz's car was nearly bumper to bumper with the cruiser, Swoap directed his spotlight into the vehicle, seeing Getz for the first time. According to Swoap, Getz "appeared agitated. He was saying something. His mouth and his forehead just looked like he was not happy." (Swoap Dep. at pp. 25-26). Getz's car lurched forward and then backed up as he attempted to go around the cruiser. Although Getz was travelling at a slow rate of speed, he was driving straight at Swoap, who drew his sidearm and again commanded him to stop the car. Therefore, the second *Graham* factor weighs in the Defendant's favor.

Consideration of the third factor under *Graham* contemplates active resistance or the attempt to flee. The circumstances here contain examples of both types of behavior.

After Getz got out of his car he yelled at Swoap to "get the fuck off" his property. (*Id.* at p. 32). When Swoap asked him to identify himself, Getz refused to give Swoap his name stating, "You know who I am. Everyone knows who I am." (*Id.*) Getz continued to yell and argue as Swoap attempted to calm him down. As Getz was standing outside of his vehicle with the door open, he told Swoap he was leaving and made a motion towards his vehicle. (*Id.* at pp. 37-38). Swoap repeatedly told Getz he was not free to leave. (*Id.* at p. 40).

Despite Swoap's clear instruction, Getz got into his car in an attempt to start the vehicle. (*Id.*) Swoap moved towards Getz and while Getz's car door was still open, reached in and took hold of Getz's left hand, which was gripping the steering wheel. (*Id.* at pp. 40-41). Getz attempted to push Swoap away with his shoulder and told the deputy to get off him. (*Id.* at p. 41).

14

While Swoap then removed Getz from his vehicle, he encountered active resistance to his efforts as Getz "was pulling back in the opposite direction that I was pulling." (*Id.* at p. 43). Once Getz was out of the vehicle, Swoap advised him to put his hands behind his back as he was under arrest. (*Id.* at p.44). Getz did not comply. Getz told Swoap he was "going inside" and began to walk towards his house. (*Id.*) Swoap then stepped in front of him and advised him to put his hands behind his back but Getz again failed to comply. (*Id.* at p. 45).

Swoap then grabbed Getz's upper arm and employed a technique to displace Getz's balance. (*Id.*) Getz then spun around and sprawled himself, stomach first, over the hood of Swoap's cruiser. (*Id.* at p. 46). With one hand, Getz grabbed the push bar on the front of the cruiser and grabbed at the top of the hood with his other. (*Id.* at p. 47). Swoap then reached over and grabbed Getz's left wrist (gripping the push bar) and handcuffed that wrist. (*Id.* at pp. 47-48). Getz was instructed to bring his right wrist behind his back, but he did not comply and was still gripping the push bar with his left hand. (*Id.* at p. 48). Swoap then took hold of Getz's right arm, rotated his body around, and handcuffed his right wrist. At this point, Getz stood up. (*Id.*)

Swoap told Getz they were going to the other side of the cruiser but Getz repeated he was going inside and tried to pull away from Swoap. (*Id.*) As Swoap was walking Getz to the car, the plaintiff locked up his legs and upper body, requiring Swoap to guide him in the right direction, all the while keeping a firm grip so Getz did not fall as they moved together toward the car. (*Id.* at pp. 48-49).

When viewed in the light most favorable to the Plaintiff, these circumstances demonstrate repeated instances of active resistance and attempts to flee or leave the scene in the face of clear commands to the contrary by the officer. Getz disregarded Swoap's directives, displayed a pattern of continued resistance, and responded to the law enforcement officer's directives with yelling and cursing. Clearly, when viewed through a totality of the circumstances, Getz exhibited uncooperative

15

and hostile behavior which went beyond mere protestations. I cannot find Deputy Swoap's actions in handcuffing Getz rise to the level of unreasonable force under these circumstances. Therefore, the Plaintiff has failed to establish a constitutional violation under the Fourth Amendment in the application of the handcuffs by Deputy Swoap and Defendants' motion is well taken as to the application of handcuffs branch of their dispositive motion.

### 2  Maintenance of the Handcuffs

To survive summary judgment on an excessive force claim based upon handcuffing, the following must be established: (1) the plaintiff complained the handcuffs were too tight; (2) the officer ignored the complaints; and (3) the plaintiff experienced some physical injury. *Morrison*, 583 F.3d at 401 *citing Lyons v. City of Xenia*, 417 F.3d 565, 575-76 (6th Cir. 2005). Here, the first and third elements are not disputed. The focus of the discussion and analysis centers on whether Defendant Swoap ignored the complaints and whether his actions or inactions were objectively reasonable and rose to the level of a constitutional violation under the Fourth Amendment.

In this instance, the Plaintiff contends Swoap ignored complaints to loosen or remove the handcuffs despite repeated pleas to do so. According to Plaintiff, Swoap's refusal to loosen the handcuffs was objectively unreasonable. I disagree.

Considering the facts in the light most favorable to the Plaintiff, Getz's statement to his daughter that he had asked Swoap to loosen the handcuffs "was made within two to four minutes after his arrest and handcuffing, and no more than three minutes from when Trisha first saw him with his face up against his car and Swoap leaning against him." (Plaintiff's opp. at p. 18).

According to the Wood County Sheriff Department's radio log, Deputy Swoap reported Getz was "in custody" at 7:24 p.m. Sergeant Spees arrived at approximately 7:29 p.m. Spees testified that upon his arrival, both Robert Getz and Deputy Swoap were standing next to the

16

cruiser. (Spees Dep. at p. 9). Robert Getz appeared to Spees to "be rigid" and Spees did not recall "any conversation going on when [he] approached." (*Id.*)

Spees began talking with Robert Getz and Deputy Swoap in an attempt "to calm it down" because Getz "seemed upset and was yelling," "calling Deputy Swoap a son of a bitch." (*Id.*) Spees observed Getz in handcuffs upon his arrival. (*Id.* at p. 10). After Spees engaged Getz in conversation, Swoap stepped back towards Spees' cruiser. (Swoap Dep. at p. 54). Spees asked Getz to have a seat in the police cruiser and Getz did so voluntarily. (*Id* at p. 55; Spees Dep. at p. 12). Spees also spoke with Swoap about the events which had transpired.

Spees recalls Robert Getz telling him that the handcuffs "were uncomfortable or they hurt." (*Id.* at p. 20). Around this same time, Beverly Getz appeared on the scene and there was conversation about contacting the rescue squad regarding his medical condition. When it was determined that he only wanted access to his inhaler and oxygen, Spees asked Swoap if he would be okay with removing the handcuffs to allow Getz to use his inhaler. (Swoap Dep. at pp. 62-63). Swoap agreed, removed the handcuffs and Getz then used his inhaler. (*Id.*) Spees estimated the handcuffs were removed from Getz less than ten minutes after he arrived on the scene. (Spees Dep. at p. 19).

Trisha Getz testified that she "was probably outside 20 minutes" before going into the house to get her mother. (Trisha Getz Dep. at pp. 60-61).

According to the varying accounts, the handcuffs remained on Robert Getz for anywhere from ten to twenty minutes. In assessing whether Swoap's conduct regarding complaints to loosen the handcuffs rises to a constitutional violation, I am mindful of the Sixth Circuit's guidance:

> Our precedents fail to notify officers that any response to a complaint of tight handcuffing other than an immediate one constitutes excessive force. Indeed, a constitutional requirement obligating officers to stop and investigate each and every

17

>utterance of discomfort and make a new judgment as to whether the handcuffs are "too tight" is neither reasonable nor clearly established.

*Fettes v. Hendershot*, 375 Fed. Appx. 528, 533 (6th Cir. 2010).

In this case, from the time Deputy Swoap first encountered Mr. Getz, he was met with active resistance, a belligerent attitude, and Mr. Getz's repeated failure to comply with the officer's directives. *Compare Brown v. Lewis*, 779 F.3d 401 (6th Cir. 2015) (excessive force found where plaintiff was entirely compliant throughout the stop, did not flee from the police, put her hands up, and exited the car when directed by the officer, yet was grabbed by the back of her shirt by two officers and thrown to the ground).

As attested to by Trisha Getz, Deputy Swoap told her he was in the process of arresting Robert Getz as she arrived on the scene. At that point Swoap was attempting to subdue Robert Getz who, while not being aggressive towards the officer, was being resistant to even walking to the police cruiser voluntarily. As Spees arrived on the scene, he witnessed Getz being uncooperative and yelling at Swoap. However, once Spees engaged Getz in conversation and took control of the situation, Getz calmed down and complained to Spees about the handcuffs. At that point, Spees engaged Swoap in a request to remove the handcuffs, which was done to allow Getz to use his inhaler.

Given the events which were unfolding at the time, the Defendant officer was presented with a non-compliant subject, and the disruption of a third-party (Trisha Getz), who came upon the scene as he was arresting Mr. Getz. The officer was also alone and still awaiting a back-up unit to arrive. Even assuming Mr. Getz initially complained about the tightness of the handcuffs, the time frame between his arrest and request to Spees to loosen the handcuffs was not an inordinate amount of time.

18

Deputy Swoap testified he did not force Mr. Getz to sit in the cruiser because he could hear the back-up unit approaching and waited for Sergeant Spees to arrive. (Swoap Dep. at p. 53). Upon his arrival, Sergeant Spees observed Mr. Getz being combative as he was yelling profanities at Deputy Swoap. It was not until Sergeant Spees intervened that Mr. Getz calmed down, voluntarily sat in the cruiser and that Plaintiff (again) complained the handcuffs were hurting him. With the situation under control, Deputy Swoap removed the handcuffs and allowed Mr. Getz to use his inhaler.

Viewing the facts in the light most favorable to the Plaintiff, even if the handcuffs were not removed for fifteen to twenty minutes, I do not find this to be objectively unreasonable under these circumstances. Given the evolving events of this situation, I cannot find a reasonable officer would have known that a failure to respond to an immediate complaint about tight handcuffs violates the Constitution. The relatively short time frame in which Mr. Getz was in handcuffs, coupled with the officer's prompt action in removing them upon a subsequent request after he had subdued Mr. Getz, at worst, falls into a category "in which qualified immunity operates to shield officers from discretionary, on-the-spot judgments." *Fettes*, 375 Fed. Appx. at 534. Accordingly, Defendant Swoap is entitled to qualified immunity on the excessive force claim alleging unlawful maintenance of the handcuffs.

## Conclusion

For the reasons stated above, the Defendants' motion for summary judgment (Doc. No. 20) is granted.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge
